FILED
2022 Jun-27  PM 03:27
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHWESTERN DIVISION

| | | |
|---|---|---|
| **INNOVATIVE HEARTH PRODUCTS, LLC,** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | Civil Action Number |
| | ) | **3:22-cv-00369-AKK** |
| **v.** | ) | |
| | ) | |
| **NORTH AMERICAN ELITE INSURANCE COMPANY,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM OPINION</u>

This lawsuit concerns an insurance policy that Innovative Hearth Products, LLC purchased from North American Elite Insurance Company to cover costs Innovative incurred from July 2019 to July 2020 due to the spread of contagious diseases. *See* doc. 1-1. That period, of course, came to include the onset of the COVID-19 pandemic. According to Innovative, North American Elite improperly denied coverage of the claim that Innovative filed for its ensuing losses. *Id.*

Now before the court is North American Elite's motion to dismiss on *forum non conveniens* grounds based on the insurance policy's forum-selection provision.[1]

---

[1] Also pending is Innovative's motion to strike North American Elite's reply brief for exceeding the court's page limit. Doc. 17. In opposition, North American Elite says that Innovative "merely points out a technicality." Doc. 18 at 2. The court certainly does not view adherence to its orders as a "technicality." "A district court has inherent authority to manage its own docket 'so as to achieve the orderly and expeditious disposition of cases,'" and page limits certainly fall within that authority. *See Equity Lifestyle Props., Inc. v. Fla. Mowing & Landscape Serv., Inc.*, 556 F.3d

Doc. 5.  The motion is briefed, docs. 6; 10; 16, and due to be granted.  In short, the forum-selection clause, which is valid and enforceable, requires adjudication of this coverage dispute in New York state court.

## I.[2]

Innovative operates a manufacturing facility in Russellville, Alabama.  Doc. 1-1 at 3.  Innovative purchased North American Elite's "Leading Edge All-Risk Form General Property Domestic Insurance Policy" for a period covering July 15, 2019, to July 1, 2020.  *Id.*  *See also id.* at 14–99 (the Policy).  Relevant here, under the Policy, North American Elite agreed to cover certain costs Innovative incurred due to the presence of a "communicable disease" at Innovative's facility.  *See id.* at 3.  Specifically, the Policy provided:

---

1232, 1240 (11th Cir. 2009).  And here, North American Elite had plenty of time to familiarize itself with the proper procedures in light of the two extensions it received, one of which it requested after the briefing deadline had already expired.  *See* docs. 11; 12; 13; 15.  Because motions to strike provide "drastic" remedies, *Augustus v. Bd. of Pub. Instruction of Escambia Cnty., Fla.*, 306 F.2d 862, 868 (5th Cir. 1962), in lieu of striking the brief, the court has opted to stop reading it at page five, where it should have ended.

[2] "In reviewing a motion to dismiss for *forum non conveniens*, [the court] accept[s] as true the factual allegations in the complaint to the extent they are uncontroverted by affidavits or other evidence . . . . [and] also draw[s] all reasonable inferences in favor of the plaintiff[]."  *Otto Candies, LLC v. Citigroup, Inc.*, 963 F.3d 1331, 1336 (11th Cir. 2020).  Innovative attaches a copy of the insurance policy and other exhibits to its complaint, *see* doc. 1-1, and the court considers only these attachments in ruling on the motion.  *See Hoefling v. City of Miami*, 811 F.3d 1271, 1277 (11th Cir. 2016) ("A district court can generally consider exhibits attached to a complaint in ruling on a motion to dismiss, and if the allegations of the complaint about a particular exhibit conflict with the contents of the exhibit itself, the exhibit controls.").  The parties attach other exhibits to their briefing, but these materials are of minimal salience to the crux of the pending motion, and the court does not rely on them.

> If an INSURED LOCATION owned, leased or rented by [Innovative] has the actual not suspected presence of COMMUNICABLE DISEASE and access to such INSURED LOCATION is limited, restricted or prohibited by:
>
> > a. an order of an authorized governmental agency regulating the actual not suspected presence of COMMUNICABLE DISEASE; or
> >
> > b. a decision of an Officer of [Innovative] as a result of the actual not suspected presence of COMMUNICABLE DISEASE,
>
> this POLICY covers the reasonable and necessary costs incurred by [Innovative] at such INSURED LOCATION with the actual not suspected presence of COMMUNICABLE DISEASE for the:
>
> > a. cleanup, removal and disposal of the actual not suspected presence of COMMUNICABLE DISEASES from INSURED PROPERTY; and
> >
> > b. actual costs of fees payable to public relations services or actual costs of using [Innovative's] employees for reputation management resulting from the actual not suspected presence of COMMUNICABLE DISEASES on INSURED PROPERTY.

*Id.* at 38.  In sum, the Policy conditioned coverage on the actual presence of a contagious disease at Innovative's facility and on an order from an Innovative officer or the government consequently restricting access to the facility.  *Id.* at 4.

On March 25, 2020, an Innovative employee tested positive for COVID-19, and  Innovative decided to suspend operations pending the sanitation of the facility.  *See id.*  Jason Pickering, Innovative's chief operating officer, shared this decision with the company's workforce.  *See id.*  Pickering also "issued a memorandum

entitled 'COVID-19 Workforce Impact'" to inform employees that Innovative would begin temporary layoffs. *Id. See also id.* at 101 (the Memorandum).

The facility remained closed for five days. *Id.* at 4. On March 30, 2020, employees began to return to work "in a limited capacity," and the facility restarted full operations on April 1, 2020. *Id.* Innovative claims that since then, "[it] has continued to experience reduced workforce as an impact of COVID-19's actual presence at the [f]acility," "[t]he threat of the virus has also hindered [its] ability to hire additional workers," and more employees have tested positive for the virus. *Id.* at 4–5. Innovative claims losses from "lost sales and cleaning and disinfecting costs" and "lost profits due to a requirement to provide paid sick time." *Id.*

Innovative filed a claim with North American Elite for these losses in 2020. *Id.* at 5. In March 2021, an adjuster from Engle Martin & Associates, the firm North American Elite assigned to investigate the Claim, wrote to Innovative regarding North American Elite's position. *Id. See also id.* at 103–13 (Engle Martin's March 2021 letter). Engle Martin told Innovative that the core of the Policy "[did] not provide coverage for the Claim" but that it "appear[ed] . . . coverage [was] available under the Interruption by Communicable Disease and Communicable Disease Response coverage extensions (subject to the applicable sublimit, deductible and waiting period) for the Claim." *See id.* at 103, 111.

About three months later, Engle Martin requested supporting documentation, including explanations of Innovative's sanitation costs, the locations where COVID-19-positive employees worked, and a copy of the decision from an Innovative officer that limited access to the facility due to the presence of COVID-19. *See id.* at 115–17 (Engle Martin's June 2021 letter). Several weeks later, Pickering supplied documentation and affirmed that the Claim arose "under the Interruption by Communicable Disease and Communicable Disease Response coverage extensions which [Engle Martin] specifically highlight[ed] as available on [the] [P]olicy." *See id.* at 119 (Pickering's July 2021 letter).

In September 2021, Engle Martin confirmed the denial of coverage. *Id.* at 121–28 (Engle Martin's September 2021 letter). Engle Martin explained that Innovative had failed to provide an order from an Innovative officer or a government agency that restricted access to the facility due to the presence of COVID-19. *See id.* at 127. Tom Krebs, Innovative's president and chief executive officer, responded three weeks later by citing Innovative's belief that Pickering's Memorandum constituted such an order and resupplied documentation. *Id.* at 130 (Krebs' September 2021 letter). Engle Martin replied that the Memorandum did not qualify because it "[did] not reference a closure but only a decision to reduce [Innovative's] workforce" and that Innovative also did not adequately confirm the actual presence of COVID-19 at the facility. *Id.* at 132–34 (Engle Martin's November 2021 letter).

Relevant here, the Policy provides that "the laws of the State of New York" govern the Policy's "construction and interpretation" and that the parties "irrevocably submit[ted] to the exclusive jurisdiction of the Courts of the State of New York" and "expressly waive[d] all rights to challenge or otherwise limit such jurisdiction" to the extent permitted by law. *Id.* at 75.   Notwithstanding these provisions, Innovative sued North American Elite in Alabama state court over the Claim, and North American Elite removed the case to this court based on diversity jurisdiction. *See* doc. 1.

## II.

Innovative asserts that North American Elite breached the Policy and denied coverage in bad faith and seeks a judgment ordering North American Elite to fulfill its obligations under the Policy.  Doc. 1-1 at 8–10.  North American Elite moves to dismiss based on the Policy provision requiring adjudication in New York state court.  *See* docs. 5; 6 (citing doc. 1-1 at 75).  Innovative maintains that the provision is unenforceable because applying New York law would deprive Innovative of a remedy and contravene Alabama's public policy related to the statute of limitations[3] and that Alabama is the more appropriate forum for this lawsuit.  *See* doc. 10.

---

[3] The Policy requires lawsuits "for the recovery of any claim" to be filed within 12 months after "the date of the physical loss or damage giving rise to any claim hereunder."  Doc. 1-1 at 74. Innovative contends that North American Elite would argue that this lawsuit is barred by the statute of limitations.

A.

The doctrine of *forum non conveniens* empowers the court to decline jurisdiction "where it appears that the convenience of the parties and the court, and the interests of justice indicate that the action should be tried in another forum." *Ford v. Brown*, 319 F.3d 1302, 1306–07 (11th Cir. 2003). The analysis "begin[s] with the premise that the plaintiff's choice of forum rarely should be disturbed." *Del Monte Fresh Produce Co. v. Dole Food Co.*, 136 F. Supp. 2d 1271, 1276 (S.D. Fla. 2001). The inquiry then asks (1) whether an "available and adequate" alternative forum exists and, if yes, whether (2) "the private and public interests" favor adjudication there and (3) the plaintiff can reinstate the lawsuit in that forum "without undue inconvenience or delay." *See Otto Candies, LLC v. Citigroup, Inc.*, 963 F.3d 1331, 1338 (11th Cir. 2020); *Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 951 (11th Cir. 1997). In brief, "[i]n the typical case," a court considering a *forum non conveniens* motion "must evaluate both the convenience of the parties and various public-interest considerations." *Atl. Marine Constr. Co. v. U.S. Dist. Ct. for the W. Dist. of Tex.*, 571 U.S. 49, 62 (2013).[4]

---

[4] *Atlantic Marine* discussed both motions to dismiss for *forum non conveniens* and motions to transfer under 28 U.S.C. § 1404(a). *See Atl. Marine*, 571 U.S. at 62. The Court explained that "[s]ection 1404(a) is merely a codification of the doctrine of *forum non conveniens* for the subset of cases in which the transferee forum is within the federal court system," in which "Congress has replaced the traditional remedy of outright dismissal with transfer." *Id.* at 60.

"The calculus changes, however, when the parties' contract contains a valid forum-selection clause, which 'represents the parties' agreement as to the most proper forum.'"[5]  *Id.* at 63; *see Vanderham v. Brookfield Asset Mgmt., Inc.*, 102 F. Supp. 3d 1315, 1318–19 (S.D. Fla. 2015) ("The presence of a valid forum-selection clause requires district courts to adjust their usual *forum non conveniens* analysis . . . ."); *Guest Assocs., Inc. v. Cyclone Aviation Products, Ltd.*, 30 F. Supp. 3d 1278, 1283 (N.D. Ala. 2014) (same).  For one, the plaintiff's choice of forum no longer merits weight, and "the plaintiff bears the burden of establishing that transfer to the forum for which the parties bargained is unwarranted."  *Atl. Marine*, 571 U.S. at 63.  Also, the court "must deem the private-interest factors to weigh entirely in favor of the preselected forum" and "may consider arguments about public-interest factors only."  *Id.* at 64.  And "the plaintiff's chosen venue's choice-of-law rules will not apply."  *Vanderham*, 102 F. Supp. 3d at 1319.  Practically, "forum-selection clauses should control except in unusual cases."  *Atl. Marine*, 571 U.S. at 63.

Before determining whether this modified analysis applies, however, "the Court must first determine whether the forum-selection clause is valid and enforceable."  *Vanderham*, 102 F. Supp. 3d at 1319.  To answer this question, the

---

[5]  Importantly, "the appropriate way to enforce a forum-selection clause pointing to a state . . . forum," as here, "is through the doctrine of *forum non conveniens*."  *Atl. Marine*, 571 U.S. at 62.  *See also Vernon v. Stabach*, No. 13–62378–CIV, 2014 WL 1806861, at *2 (S.D. Fla. May 7, 2014) (noting that "a federal district court, when faced with a forum[-]selection clause designating another federal district court . . . , should transfer the case, not dismiss it," but that the court, when faced with a clause designating a state forum, should dismiss the case).

court must start with "the presumption that the clause is valid and enforceable," and

Innovative can overcome this presumption with a "'strong showing' that

enforcement would be unfair or unreasonable under the circumstances."  *See Rucker*

*v. Oasis Legal Fin., L.L.C.*, 632 F.3d 1231, 1238 (11th Cir. 2011).  Under the *Bremen*

test,[6] forum-selection clauses are unenforceable if

> (1) their formation was induced by fraud or overreaching; (2) the plaintiff effectively would be deprived of its day in court because of the inconvenience or unfairness of the chosen forum; (3) the fundamental unfairness of the chosen law would deprive the plaintiff of a remedy; or (4) enforcement of such provisions would contravene a strong public policy.

*See Krenkel v. Kerzner Int'l Hotels Ltd.*, 579 F.3d 1279, 1281 (11th Cir. 2009) (citing

*Lipcon v. Underwriters at Lloyd's, London*, 148 F.3d 1285, 1296 (11th Cir. 1998)).

B.

In this case, the provision containing the forum-selection clause reads:

> 1. The laws of the State of New York, without regard to its conflict of laws rules, that would cause the application of the laws of any other jurisdiction, shall govern the construction and interpretation of this POLICY.

> 2. The parties hereto do irrevocably submit to the exclusive jurisdiction of the Courts of the State of New York, and to the extent permitted by law, the parties expressly waive all rights to challenge or otherwise limit such jurisdiction.

---

[6] "Where, as here, the forum[-]selection clause requires filing in state court and a party seeks to enforce the clause by moving to dismiss," both the Eleventh Circuit and Alabama courts apply the *Bremen* test, so named for the Supreme Court's decision in *M/S Bremen v. Zapata Off-Shore Company*, 407 U.S. 1 (1972).  *See Rucker*, 632 F.3d at 1235–36.  Thus, "there is no conflict between Alabama and federal law regarding the validity of forum[-]selection clauses," and the court can "apply state and federal law harmoniously" while sitting in diversity.  *See id.*

Doc. 1-1 at 75.  Also relevant is the Policy's limitations provision, which reads:

> No suit or action on this POLICY for the recovery of any claim shall
> be sustainable in any court of law unless all the requirements of this
> POLICY shall have been complied with, and unless commenced within
> twelve (12) months next after the date of the physical loss or damage
> giving rise to any claim hereunder.[7]

*Id.* at 74.  Innovative claims that the forum-selection clause is unenforceable because

New York law would enforce the Policy's limitations period, depriving Innovative

of a remedy and contravening Alabama's public policy.  Doc. 10 at 4, 6.

### 1.

A forum-selection clause strips a litigant of a remedy if the law of the

preselected forum "would necessarily preclude recovery for the plaintiff."  *Fred*

*Lurie Assocs., Inc. v. Glob. All. Logistics, Inc.*, 453 F. Supp. 2d 1351, 1355 (S.D.

Fla. 2006); *Vanderham*, 102 F. Supp. 3d at 1319–20.  But the court "will not

invalidate choice clauses . . . simply because the remedies available in the

---

[7] The choice-of-law and forum-selection clauses (the Choice Clauses) use terms like "shall" and "exclusive," suggesting their application is mandatory.  *See Emerald Grande, Inc. v. Junkin*, 334 F. App'x 973, 975–76 (11th Cir. 2009) (distinguishing permissive and mandatory choice clauses); *Landau v. Newland Int'l Props., Corp.*, No. 10–81466–CIV–DIMITROULEAS, 2011 WL 13227739, at *2 (S.D. Fla. June 10, 2011) (finding that the language "[t]his contract is subject to" and "any dispute concerning it will be subject first and foremost to" made the forum-selection clause mandatory).  Also, the Choice Clauses appear to cover the claims in this lawsuit, as evidenced by their broad inclusion of actions concerning "the construction and interpretation" of the Policy.  *See* doc. 1-1 at 75; *Landau*, 2011 WL 13227739, at *2 (discussing the "broad construction" of a forum-selection clause applying to "any dispute concerning" the contract).  Thus, read in conjunction with the Policy provision requiring lawsuits "for the recovery of any claim" to be filed within one year of the event(s) creating the alleged loss or damage, doc. 1-1 at 74, the instant lawsuit appears to be subject to the Policy's Choice Clauses and one-year limitations period.  Innovative does not contest this reading.  *See* doc. 10 at 4.

contractually chosen forum are less favorable than those available" in the current forum. *See Lipcon*, 148 F.3d at 1297. Rather, "the remedies available in the chosen forum [must be] so inadequate that enforcement would be fundamentally unfair." *Id.* The inquiry rests on whether "the nature of the law" of the preselected forum would preclude recovery, regardless of whether litigating in that forum would make recovery difficult or inconvenient. *See Fred Lurie*, 453 F. Supp. 2d at 1355.

Innovative maintains that enforcement of the Choice Clauses would deprive it of a remedy because adjudication in New York would "allow [North American Elite] to use its own dilatory conduct to avoid liability . . . through reliance on the Policy's limitations provision." Doc. 10 at 4, 7–8. Innovative explains that the damage giving rise to its Claim occurred in March and April 2020, doc. 10 at 4–5; the Policy required Innovative to file its lawsuit within one year of these events, doc. 1-1 at 74; North American Elite did not deny coverage until late 2021, doc. 10 at 4– 5; Innovative did not file suit until early 2022, doc. 1-1; and New York law would hold Innovative to the one-year limitations period while Alabama law would not, doc. 10 at 4–5. As a result, according to Innovative, "[e]nforcement of the [Choice Clauses] would . . . appear to bar [its] recovery" as untimely. *Id.*

Innovative accurately notes that, unlike Alabama law, New York law would seem to enforce the Policy's one-year limitations provision. In New York, parties must commence "an action upon a contractual obligation or liability" within six

years, N.Y. C.P.L.R. § 213, "unless . . . a shorter time is prescribed by written agreement," *id.* § 201.  *See Allman v. UMG Recordings*, 530 F. Supp. 2d 602, 606–07 (S.D.N.Y. 2008).  On the other hand, while Alabama law also requires contract actions to "be commenced within six years," ALA. CODE § 6-2-34(9), "any agreement or stipulation, verbal or written, whereby the time for the commencement of any action is limited to a time less than that . . . is void," *id.* § 6-2-15.

But the parties presumably bargained for this shorter limitations period, and this is not a case in which the parties agreed to a forum that fails to recognize a variety of legal claims.  Rather, Innovative and North American Elite contracted for an insurance policy governed by New York law and in New York state court with a limitations period of one year, doc. 1-1 at 74–75, as allowed under New York law, *see* N.Y. C.P.L.R. § 201.  In that respect, it is not the nature of New York law that may render an unfair outcome for Innovative, but instead that the agreed-upon Policy gave Innovative one year to sue or, more specifically, that North American Elite allegedly delayed resolution of the Claim to bring it outside of the limitations window.  To state the obvious, Innovative should not be penalized for waiting on an answer from North American Elite before filing suit, and a fairer agreement may have started the one-year window at the denial of coverage rather than from the date of the physical loss.  However, it is not this court's role to rewrite the Policy.  And Innovative cannot use the limitations provision to show that New York law is

"fundamentally unfair" or that enforcing the Choice Clauses "would necessarily preclude [Innovative's] recovery." *See Fred Lurie*, 453 F. Supp. 2d at 1355.

A final comment on this issue. The New York statute permitting contractually shortened limitations periods is not without exceptions, potentially for the dilatory conduct in which North American Elite allegedly engaged. *See, e.g.*, *Neary v. Nationwide Mut. Fire Ins. Co.*, 17 A.D. 3d 331, 331 (N.Y. Sup. Ct. 2005) (mentioning "whether the defendant . . . should be estopped from asserting the limitations period as a defense because it engaged in conduct which lulled the plaintiffs into sleeping on their legal rights").[8] This further bolsters the conclusion that the nature of New York law is not so fundamentally unfair that its enforcement would strip Innovative of all hope of recovery. *See Lipcon*, 148 F.3d at 1297. Indeed, to the extent that Innovative believes North American Elite "lulled [it] into sleeping on its rights under the [Policy]," *see Neary*, 17 A.D. 3d at 331, Innovative could raise these arguments in the appropriate forum, including by pointing out that the initial response it received from Engle Martin, which suggested that "coverage [was] available," doc. 1-1 at 103, 111, gave Innovative no reason to believe it had to file a lawsuit at that juncture to preserve the statute of limitations.

---

[8] *See also Gilbert Frank Corp. v. Fed. Ins. Co.*, 520 N.E. 2d 512, 514 (N.Y. 1988) (concluding, for purposes of the plaintiff's waiver and estoppel arguments, that the facts failed to "show that [the] defendant, by its conduct, otherwise lulled [the] plaintiff into sleeping on its rights under the insurance contract").

2.

As to Innovative's second argument, Alabama's fundamental public policy "is to be found in its constitution, its statutes, the decision[s] of or settled rules laid down by its courts, and the prevailing social and moral attitudes of the community." *San Francisco Residence Club, Inc. v. Baswell-Guthrie*, 897 F. Supp. 2d 1122, 1172 (N.D. Ala. 2012) (quoting 16 AM. JUR. 2D *Conflict of Laws* § 18 (2012)); *see Rucker*, 632 F.3d at 1238. "Fundamental" public policy is "substantial" and "may be embodied in a statute which makes one or more kinds of contracts illegal or which is designed to protect a person against the oppressive use of superior bargaining power." *Cherry, Bekaert & Holland v. Brown*, 582 So. 2d 502, 506–07 (Ala. 1991) (holding that courts will not give effect to a party's choice of law if that law "would be contrary to Alabama policy").[9]  And "[w]hen a party contends that a forum-selection clause conflicts with the public policy manifested by a statutory provision," courts should "discern the contours" of the public policy in the statute by examining its text and history. *Turner v. Sedgwick Claims Mgmt. Servs., Inc.*, No. 7:14–CV–1244–LSC, 2015 WL 225495, at *6 (N.D. Ala. Jan. 16, 2015).

Innovative first cites as evidence of strong Alabama's public policy the state statute barring the shortening of limitations periods:

---

[9] "[T]his line of reasoning is often invoked in the context of covenants not to compete," for example, "which have repeatedly been held to fly in the face of Alabama public policy." *Harper v. O'Charley's, LLC*, No. 16-0577-WS-M, 2017 WL 5598815, at *5 (S.D. Ala. Nov. 20, 2017).

> Except as may be otherwise provided by the Uniform Commercial
> Code, any agreement or stipulation, verbal or written, whereby the time
> for the commencement of any action is limited to a time less than that
> prescribed by law for the commencement of such action is void.

ALA. CODE § 6-2-15; doc. 10 at 8.  Certainly, this provision stands at odds with the

New York statute permitting parties to contract out of statutory limitations periods.

*See* N.Y. C.P.L.R. § 213.  But, as this court has noted, "'that fact is not tantamount

to saying that it would violate a fundamental public policy of Alabama for private

parties to contract around' the six-year statute of limitations for breach of contract

claims."  *Morse v. Life Ins. Co. of N. Am.*, 399 F. Supp. 3d 1236, 1242 (N.D. Ala.

2019) (quoting *Harper v. O'Charley's, LLC*, No. 16-0577-WS-M, 2017 WL

5598815, at *4 (S.D. Ala. Nov. 20, 2017)).  And while state legislators generally set

Alabama's public policy, *see Twin City Pipe Line Co. v. Harding Glass Co.*, 283

U.S. 353, 357 (1931), Innovative fails to articulate how § 6-2-15 in particular

embodies strong public policy, especially considering that Alabama "has long

recognized the right of parties to an agreement to choose a particular state's laws to

govern an agreement," *Cherry, Bekaert & Holland*, 582 So. 2d at 506.  Thus, "the

application of [New York's] law, which permits contractually shortened limitations

periods," is not strictly "'contrary to [a] fundamental public policy' of Alabama that

would otherwise compel the application of Alabama law."  *See Morse*, 399 F. Supp.

3d at 1242.  In other words, Innovative's argument "does not necessarily prompt a

conclusion . . . that any divergence from the Alabama statute necessarily violates a fundamental policy of Alabama." *See Harper*, 2017 WL 5598815, at *5.

The Alabama Supreme Court cases *Blalock v. Sutphin* and *Galliher v. State Mutual Life Insurance Company* that Innovative also cites do not undermine the court's conclusion. *Blalock* resolved a dispute over whether Alabama or Tennessee law governed an insurance policy. *See Blalock v. Sutphin*, 275 So. 3d 519, 523 (Ala. 2018). The Court noted that Alabama follows the *lex loci contractus* rule, meaning that if a contract does not select a state's law to govern, courts follow the law of the state where the contract was formed unless the law contravenes Alabama's public policy. *Id.* Because the policy did not specify a governing law and was formed in Tennessee, the Court evaluated whether "Tennessee's substantive law" would contradict Alabama's "fundamental public policy." *Id.* Noting that Alabama had adopted a part of the Uniform Probate Code that Tennessee had not, the Court concluded that applying Tennessee law would violate Alabama's public policy by reasoning:

> [T]he Alabama Legislature weighed the options and determined that the approach provided for in the Uniform Probate Code better reflected the presumed intent of divorced individuals in this state. Here, the decedent policyholder resided in Alabama at all times relevant to this action. He was divorced in Alabama, and he died in Alabama. His policy application listed his address in Alabama, and he received correspondence from New York Life at that Alabama address. Thus, it is appropriate that Alabama law, and not Tennessee law, govern the interpretation of his life-insurance policy to determine the beneficiaries of the policy and the impact of his divorce on the terms of that policy.

*Id.* at 524. *Blalock* therefore involved conflicting substantive presumptions baked into different states' laws about the intent of individuals who purchased insurance policies prior to divorcing. *See id.*

Here, Innovative contends that New York's manner of enforcing a cause of action that is available under both New York and Alabama law contravenes Alabama's public policy because of an Alabama statute voiding provisions that purport to shorten the statute of limitations. *See* doc. 10 at 6–7. But following Innovative's logic, whenever another state's provision conflicts with Alabama's, absent a contractual choice clause, Alabama law would govern. Further, setting aside the absence of a choice clause in *Blalock*, the differing natures of the laws in that case and this one distinguish Innovative's alleged public-policy violation from the substantive contradiction in *Blalock*. The court therefore questions the extent of *Blalock*'s application to this case.

*Galliher*, while more on point, also fails to demonstrate that applying New York law here would contradict Alabama's public policy. The Court, conceding that an insurance policy "[was] a Georgia contract, and that the clause shortening the statute of limitations would be binding in the state of Georgia," determined that § 2802 of the 1896 Code[10] "expressly prohibited" this limitations clause. *See Galliher v. State Mut. Life Ins. Co.*, 43 So. 833, 834–35 (Ala. 1907). The Court

_____

[10] Section 2802 was the precursor to Alabama Code § 6-2-15. Credits, ALA. CODE § 6-2-15.

relied on the principle "that the *lex loci contractus* must govern as to the validity, interpretation, and construction of the contract; but the remedy to enforce it . . . must be pursued according to the law of the forum where the suit is brought" to conclude that Alabama law governed.  *See id.* (italics added).  In so holding, the Court remarked that "if the limitation [was] an inherent part of the contract, and [did] not merely apply to the remedy for its enforcement, then it would be contrary to . . . section 2802 . . . and would not be upheld in this state." *Id.* at 835.

*Galliher* therefore underscored the distinction between a contract's interpretation and its remedies, the latter of which require application of the laws of the forum state in the absence of a choice clause.  *See id.* at 834–35.  To be sure, the Court also noted that even if the shortened limitations period "[was] an inherent part of the contract," the Court would not enforce it.  *See id.* at 835.  Again, however, on the court's read, it does not automatically follow that § 6-2-15 reflects Alabama's "strong" public policy.  This is especially so because, in the century following *Galliher*, Alabama law has continuously "recognized the right of parties to an agreement to choose a particular state's laws to govern an agreement," *Polaris Sales, Inc. v. Heritage Imports, Inc.*, 879 So. 2d 1129, 1133 (Ala. 2003), even with respect to statutes of limitations, *see Harper*, 2017 WL 5598815, at *4.

18

In sum, Innovative fails to establish that enforcing the Choice Clauses would contradict Alabama's strong public policy.[11]  *See* doc. 10 at 6–8.  Accordingly, and in conjunction with the findings in Section II.B.1, the forum-selection clause is valid and enforceable, and the court proceeds to apply the "modified" analysis articulated in *Atlantic Marine*.  *See Vanderham*, 102 F. Supp. 3d at 1320.

## C.

The first part of the modified *Atlantic Marine* analysis requires the court to "determine whether an adequate alternative forum exists."  *Id.*  As discussed, the parties consented to the jurisdiction of New York state courts, where Innovative can raise the same claims and where, should North American Elite attempt to enforce the Policy's one-year limitations period, Innovative can assert an exception.  *See supra* § II.B.  Accordingly, the court finds that New York "is both available and adequate as an alternative forum."  *See Vanderham*, 102 F. Supp. 3d at 1320.

"Second, the Court must consider the relevant public interest factors to determine whether dismissal is appropriate."  *Id.*; *see Atl. Marine*, 571 U.S. at 63–64.  At this stage, the court "must deem the private-interest factors to weigh entirely

---

[11] Nor does Innovative establish that enforcement would offend Alabama law that "makes one or more kinds of contracts illegal or which is designed to protect a person against the oppressive use of superior bargaining power."  *See Cherry, Bekaert & Holland*, 582 So. 2d at 506–07.  Innovative does not plead that it entered the Policy out of an "oppressive use of superior bargaining power" that Alabama law would protect against.  *See id.*  In any event, New York law permits parties to circumvent a limitations period in certain cases of wrongdoing, *see supra* § II.B.1, which suggests that the enforcement of New York law would not offend Alabama's public policy in this respect.

in favor of the preselected forum" and only considers arguments about the public interest. *Atl. Marine*, 571 U.S. at 64. "Public interest considerations include factors such as (1) the forum's interest in entertaining the suit; (2) court congestion and jury duty generated by the lawsuit; (3) the desirability of having localized controversies decided at home; and (4) the difficulty in determining applicable law and applying foreign law." *Pierre-Louis v. Newvac Corp.*, 584 F.3d 1052, 1061 (11th Cir. 2009).

Here, while Alabama has an interest in adjudicating an insurance dispute stemming from alleged losses in Alabama, *see* doc. 10 at 13, North American Elite hosts its principal place of business in New York, where the parties agreed to adjudicate Policy-related disputes, *see* doc. 16 at 5. And the parties agree that Innovative's legal claims reflect "a straightforward contract issue," *see* docs. 10 at 14; 16 at 5, suggesting that the case will not present issues for court congestion or challenges in applying the appropriate standards under New York law. Together, these factors weigh in favor of dismissal for proper adjudication in the state courts of New York, where judges are substantially more familiar with the nuances of New York law and the remedies, defenses, and exceptions that may apply. *See Ford*, 319 F.3d at 1307 ("There is an appropriateness, too, in having the trial of a diversity case in a forum that is at home with the state law that must govern the case . . . .").

Finally, Innovative can reinstate its lawsuit in New York without undue inconvenience or delay. *See Otto Candies*, 963 F.3d at 1338. Innovative claims that

20

"requiring [it] to re-file in New York will cause undue prejudice due to the likelihood that New York courts will enforce the Policy's limitations period."  Doc. 10 at 14. But the court has already determined that New York law governs Innovative's claims, and if North American Elite challenges the timeliness of the lawsuit, Innovative will have the opportunity to address possible exceptions to this limitations defense in the proper forum.

### III.

The court turns finally to Innovative's argument that "if dismissal is appropriate, . . . the Court [should] condition dismissal on [North American Elite's] waiver of jurisdictional or limitations period defenses that it may assert in New York."  *Id.*  It is true that "[i]n order to avoid unnecessary prejudice to [plaintiffs]," the court "can attach conditions to a dismissal with which the defendants must agree," *Ford*, 319 F.3d at 1307, including that the defendants "waive any statute of limitations . . . defenses," *Magnin v. Teledyne Continental Motors*, 91 F.3d 1424, 1430 (11th Cir. 1996).  However, the court discerns no basis for using its discretion to impose such a qualification.

Whether North American Elite dragged its feet in denying the Claim is a factual dispute inappropriate for this court to resolve at this juncture.  And regardless, New York law seems to permit Innovative to raise this issue as an exception to the imposition of the one-year limitations period.  *See, e.g.*, *Neary*, 17 A.D. 3d at 331.

21

Thus, dismissing this case with the requirement that North American Elite waive limitations-based defenses would effectively adjudicate a disputed possible defense. The court declines to impose such a condition.

## IV.

For the foregoing reasons, the court will grant North American Elite's motion to dismiss, doc. 5, for *forum non conveniens* based on the Policy's valid forum-selection clause.  A separate order dismissing this case without prejudice follows.

**DONE** the 27th day of June, 2022.

**ABDUL K. KALLON**
UNITED STATES DISTRICT JUDGE